Fred BURTON, Plaintiff,

v.

Milton SHAPP, Governor of the Commonwealth of Pennsylvania, Israel Packel, Attorney General for the Commonwealth of Pennsylvania, Stewart Werner, Commissioner of the Bureau of Correction for the Commonwealth of Pennsylvania, James Howard, Warden of the State Correctional Institution at Pittsburgh, Charles Zimmerman, Deputy Warden of the State Correctional Institution at Pittsburgh, William Jennings, Deputy Warden of the State Correctional Institution at Pittsburgh, Lawrence Weyandt, Major of the Guards at the State Correctional Institution at Pittsburgh, John Jasak, Captain of the Guards at the State Correctional Institution at Pittsburgh, David Young, Casework Supervisor at the State Correctional Institution at Pittsburgh, Charles Kozakiewcz, Lieutenant of the Guards, James Robles, Sergeant of the Guards at the S.C.I. Pgh. in charge of the B.A.U., Sergeant Caruthers, Sergeant of the Guards of the S.C.I. Pgh., in charge of the B.A.U., Their Agents, Subordinates and Employees.

Frederick BURTON, Plaintiff,

v.

William B. ROBINSON, individually and in his official capacity as Commissioner of Corrections of the Commonwealth of Pennsylvania, together with his Agents and Successors in Interest, Stewart Werner, individually and in his former official capacity as Commissioner of Corrections of the Commonwealth of Pennsylvania, Robert L. Johnson, individually and in his former official capacity as Superintendent of the State Correctional Institution at Graterford, Pennsylvania, Julius T. Cuyler, individually and in his official capacity as Superintendent of the State Correctional Institution at Graterford together with his Agents and Successors in interest, Joseph Brierly and Gilbert A. Walters, individually and in their former official capacities as Superintendent of the State Correctional Institution at Pittsburgh, Pittsburgh, Pennsylvania, James E. Howard, individually and in his official capacity as Superintendent of the State Correctional Institution at Pittsburgh together with his Agents and Successors in Interest.

Civ. A. Nos. 74–1101, 78–381.

United States District Court,
W.D. Pennsylvania.

Nov. 22, 1983.

Paul Gettleman, Zelienople, Pa., for plaintiff.

Egler, Anstandig, Garrett & Riley, Jose Hernandez-Cuebas, Asst. Atty. Gen., Com. of Pa., Pittsburgh, Pa., for defendants.

## OPINION

WEBER, District Judge.

The above-captioned matter is before us on remand for reconsideration in light of the holding in *Hewitt v. Helms*, — U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). The parties have agreed that no further evidentiary hearings are necessary because the record as it now stands is sufficient for our purposes. The parties have submitted briefs on the issue and the matter is now ripe for disposition.

## I. HISTORY

A brief review of the factual and procedural history of this case is in order. A more detailed understanding may be gleaned from the previous opinions and orders.[1]

This case originally consisted of the claims of a number of inmates held in administrative segregation in the Behavioral Adjustment Unit (BAU) at the State Correctional Institution (SCI) at Pittsburgh. We are now concerned solely with the due process claims of plaintiff Burton regarding his confinement in the BAU.

Burton was confined at SCI Holmesburg, serving a sentence for homicide, when he was involved in the killing of two corrections officials. Burton was ultimately transferred to SCI Pittsburgh and placed in the BAU. Beginning in late 1975, prison officials conducted regular monthly reviews of Burton's status, all of which ended in the same recommendation and result—continued confinement in the BAU. This suit challenges the validity of this review process.

After an evidentiary hearing this court rejected plaintiff's argument that his confinement to the BAU constituted cruel and unusual punishment. However, we did conclude that Burton's due process rights had been violated: by the failure of prison officials to set *any* objective criteria to evaluate Burton's conduct in the BAU (which the Warden described as "exemplary") and his changed attitude; by reliance on past criminality alone for continued segregation; and by the purely subjective evaluation of Burton's status. 457 F.Supp. 247 (W.D.Pa.1978) (Mims III). Burton was later returned to the general population after five years solitary confinement in the BAU. Damages and counsel fees were subsequently awarded.

On appeal, this court's finding of a due process violation and the award of damages were affirmed. No. 82–5107, slip. op. (3d Cir. Nov. 29, 1982) (Mims VI). While this matter was pending consideration by the Court of Appeals en banc, the Supreme Court decided *Hewitt v. Helms*, in an opinion which addressed the due process requirements for placement of an inmate in administrative segregation. By per curiam order the Court of Appeals remanded this matter for reconsideration in light of *Hewitt*. See, 702 F.2d 453 (Mims VII).

## ANALYSIS

The question here, simply stated, is what safeguards are required by due process for a decision to continue indefinite confinement of an inmate in administrative segregation.[2] We recognize of course that an inmate's constitutional rights are restricted insofar as necessitated by the nature of prison administration. *Wolff v. McDonnell*, 418 U.S. 539, 560, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). We note further that due process requirements are not in-

---

**1.** *Mims v. Shapp*, 399 F.Supp. 818 (W.D.Pa. 1975), (Gourley, J.) (Mims I); 541 F.2d 415 (3d Cir.1976) (Mims II); 457 F.Supp. 247 (W.D.Pa. 1978) (Mims III); sub nom. *Burton v. Shapp*, 500 F.Supp. 760 (W.D.Pa.1980) (Mims IV); 672 F.2d 903 (3d Cir.1981) (Mims V); No. 82–5107, slip op. (3d Cir. Nov. 29, 1982) (Mims VI); 702 F.2d 453 (3d Cir.1983) (Mims VII).

**2.** The threshold question of the existence of a protected liberty interest was resolved in *Hewitt*. The Court concluded that Pennsylvania regulations create a protected liberty interest in confinement to general population as opposed to administrative segregation.

flexible but are adapted to the circumstances and the interests involved. *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979).

In our previous opinion (Mims III) we concluded that the periodic review of Burton's status by prison officials failed to satisfy due process requirements for a variety of reasons outlined above. As a consequence we directed prison authorities to "develop criteria for objectively evaluating the future or potential danger posed by Burton." 457 F.Supp. at 252. The purpose of these criteria was to permit assessment of Burton as a security risk "insofar as possible ... on objective factors." *Id.*

We are now under direction to reconsider our holding as to the nature of due process safeguards required in light of *Hewitt.* We have carefully considered the Court's opinion in *Hewitt* as well as previous cases and we conclude that our previous holding in the instant case is consistent with those.

The Court in *Hewitt* addressed the minimum elements of due process required when an inmate is initially transferred to administrative segregation. The Court concluded that due process requires only "an informal nonadversary review" shortly after the change in status. —— U.S. at ——, 103 S.Ct. at 872. The subjective judgment of prison officials is recognized as valuable in such a situation and due proper deference from the courts.

In the instant case however, we face a problem differing in degree if not in kind. Unlike the situation presented in *Hewitt,* we must determine the minimum requirements of due process for a decision by prison officials to *continue* indefinite confinement in administrative segregation.

While this aspect of the problem was not addressed directly by the Court's holding in *Hewitt,* a concluding footnote does set forth views on the issue. —— U.S. at ——, n. 9, 103 S.Ct. at 874, n. 9. A requirement of periodic review is affirmed, and so we have previously held. Further, the Court affirms that such review must be meaningful, and "may not be used as a pretext for indefinite confinement of an inmate." *Id.*

What procedures then must exist as a minimum requirement of due process to insure meaningful review? That determination is dependent on a consideration of the competing interests involved and the weight accorded to them. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

The segregation of a security risk to maintain safety and internal order is of course a paramount interest of prison authorities, and was the initial impetus for Burton's segregation. It is also true however that this interest subsists only as long as the inmate continues to pose such a risk; thus the necessity for periodic review. *Hewitt,* —— U.S. at ——, n. 9, 103 S.Ct. at 874, n. 9; *Kelly v. Brewer,* 525 F.2d 394, 400 (8th Cir.1975). The government also has an interest in protecting inmate-witnesses pending investigation of misconduct charges but unlike *Hewitt,* this was not advanced as a factor in Burton's continued confinement.

In *Hewitt,* the Court concluded that the inmate's private interest was not of great consequence because the transfer to administrative segregation was merely a temporary move to a more restrictive environment that may be reasonably anticipated as a condition of confinement. However, extended indefinite confinement in administrative segregation does increase the acuteness of the inmate's interest. Extended deprivation of exercise and interpersonal contacts has adverse effects on physical and mental well-being. It is undisputed here that extended confinement to the BAU may well be psychologically damaging. While we have previously held that the deprivations incident to confinement in the BAU do not rise to the level of cruel and unusual punishment (Mims III), they do create a more significant interest for due process analysis than that attributed to the prisoner in *Hewitt,* because of the extended indefinite nature of the confinement.

The opinion in *Hewitt* does not appear to contemplate a continued deprivation of this

length. In *Hewitt*, the inmate had spent less than two months in administrative segregation and was then given a definite six month term of disciplinary segregation. Burton was continued in solitary confinement for 5 years and the prison administration contemplated no change in his status in the foreseeable future. There was no fixed term set on his confinement in BAU as would have been the case with disciplinary segregation. The actuality of such extended and indefinite confinement coupled with the deprivation inherent in administrative segregation provides impetus for more substantial procedural safeguards.

We have examined in our previous opinions the process employed in reviewing Burton's status. Every 30 days the matter was considered by the Program Review Committee (PRC). Each month the PRC submitted to the Warden a recommendation to continue confinement to the BAU for an additional 30 days. Invariably the Warden approved this recommendation.

The only factual information available to the PRC and the Warden on the issue of Burton's potential for danger was his past misconduct. While this is not an insignificant fact, it may become somewhat less probative with the passage of time as circumstances change. No other objective evidence of Burton's propensity for violence was ever adduced. This is of particular import later in Burton's confinement as his misconduct recedes into the past and his conduct and attitude improve.

▮ We are mindful that the subjective evaluations made by prison administrators play a significant role in determining whether a prisoner presents a security risk. However, that evaluation, in order to be meaningful and satisfy the minimum requirements of due process, must not be mere hunch or guesswork, but must be grounded in sufficient factual information.

▮ In the instant case, prison administrators based their monthly conclusions that Burton posed such a security risk as to require continued isolation on no more factual information than his past misconduct. Furthermore, prison officials gave no consideration to factual information, present before them and favorable to Burton, on his conduct and attitude.

It is this last omission which is perhaps most telling. Despite undisputed information that Burton's conduct in the BAU was good, even "exemplary", the PRC and the Warden made no move to upgrade Burton's status. Although Burton's refusal to communicate or cooperate, on advice of counsel pending trial and appeal for the Holmesburg killings, was cited as an aggravating factor in the Warden's decision, his cooperation after conclusion of the criminal proceedings was given no weight.

Burton's conduct and cooperative attitude evidenced a change in circumstances in the latter half of 1977. Faced with these changes, which undermined some of the basic assumptions about Burton, prison officials did nothing.

The Court noted in *Hewitt* that often the decision that a prisoner continues to pose a security risk will be based on facts adduced when the initial decision to impose administrative segregation was made. Until mid-1977, those facts may have been adequate here. However the prison administration may not ignore changing circumstances which raise questions about the inmate's current status. It is then that some further inquiry is required.

This inquiry must seek facts relevant to the issue of whether the inmate continues to present a security risk. The use of objective standards for the measurement of conduct and attitude ensures meaningful review and prevents decisions based on guesswork or vindictiveness. Such is the purpose of due process.

We do not intend to mandate a highly structured factual inquiry which operates to tie the hands of prison administrators. The objective criteria should be flexible, adaptable to individual circumstances, but directed to basic relevant factual inquiries. Nor do we intend to emasculate prison administration by depriving corrections officials of their considered judgment. Rather, the purpose of objective standards is to

provide a sound factual basis which permits the informed exercise of discretion. *Kelly*, 525 F.2d at 400. Discretionary judgment itself is not abhorred by due process; the uninformed exercise of it is.

For the reasons stated above, we reaffirm the conclusion reached in our earlier opinion—defendants deprived Burton of his right to due process because they failed to employ any objective criteria in evaluating the changing circumstances of Burton's segregation. We also reaffirm our computation of damages.

One final note is necessary. Defendants have devoted a portion of their brief to the issue of qualified immunity. We do not address this issue because we believe defendants effectively waived the defense at the pretrial conference on damages. See, No. 81–5107, slip. op. at 14–15 (3d Cir. Nov. 29, 1982). In any event, the issue is not within the limited scope of the remand. *See*, 702 F.2d 453.

An appropriate order will be entered.

### ORDER

AND NOW this 22nd day of November 1983, in accordance with the accompanying Opinion, IT IS ORDERED that the JUDGMENT ENTERED November 5, 1980 for the Plaintiff and against the Defendants in the sum of Six Thousand Seven Hundred ($6,700) Dollars is AFFIRMED.