E. Thomas Clarkin, Gray, Stewart & Clarkin, Clayton, Mo., for plaintiff.

Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for defendant.

Edward CLARK, Plaintiff,

v.

Lou V. BREWER, et al., Defendants.

Civ. No. 76–54–1.

United States District Court, S.D. Iowa, C.D.

Dec. 19, 1983.

## ORDER AND MEMORANDUM

NANGLE, Chief Judge.

IT IS HEREBY ORDERED that defendant's motion to dismiss be and is granted and plaintiff's complaint be and is dismissed. This is an action for damages arising out of an automobile accident between plaintiff's automobile and defendant's U.S. Postal Service truck. Plaintiff's administrative claim was denied by certified mail dated February 3, 1983. This letter informed plaintiff that he could file a court action within six (6) months from the date of the letter. *See* 28 U.S.C. § 2401(b). Plaintiff filed the instant action in state court on August 5, 1983, which was a Friday. It was subsequently removed to this Court pursuant to 28 U.S.C. §§ 2679(b), (d), 1442(a)(1), because defendant was acting within the scope of his employment with the United States Postal Service as a truck driver when the accident occurred. Therefore, the action is "deemed ... brought against the United States." 28 U.S.C. § 2679(d). The six-month period in 28 U.S.C. § 2401(b) is jurisdictional as it is a condition to defendant's waiver of sovereign immunity. Here, the complaint was filed two (2) days late and therefore must be dismissed. *Yedwab v. United States*, 489 F.Supp. 717 (D.N.J.1980).

Barbara Schwartz, Prisoners Assistance Clinic, Iowa City, Iowa, for plaintiff.

Thomas J. Miller, Atty. Gen. of Iowa, Gordon E. Allen, Sp. Asst. Atty. Gen., Patricia M. Hulting, Asst. Atty. Gen., Des Moines, Iowa, for defendants.

**1503**

## RULING AND ORDER

STUART, Chief Judge.

On October 11, 1983, the parties presented arguments as to the constitutional validity of the "close management policy" adopted by defendants on March 3, 1983, for implementation at Iowa State Penitentiary ("ISP"). All issues argued had been extensively briefed by the parties before the October 11 hearing. Accordingly, this action is now fully submitted and ready for the Court's ruling.

In its Order, dated April 21, 1980, the Court determined that defendants' then current plan for review of inmates in administrative solid lockup ("ASL"—the progenitor of "close management") for possible release to ISP's general population ("GP") violated plaintiff's substantive and procedural due process rights.[1] The Court determined that the criteria applied by defendants were so subjective in nature that the decision whether to continue an inmate in ASL would not even be rationally related to the stated goals of ASL placement. Thus, following *Kelly v. Brewer*, 525 F.2d 394, 401–02 (8th Cir.1975), the Court directed defendants to prepare and submit guidelines for determining in a rational manner whether an inmate should be retained in ASL.

The Court also ruled that defendants' indefinite continuation of plaintiff in ASL violated his procedural due process rights. Finding that, in his ten years in ASL, plaintiff had been given no opportunity to show his ability to conform to GP living and no guidance as to how he could attempt to prove his rehabilitation in ASL, the Court ordered defendants to prepare and submit a plan setting forth the minimal procedural protections that would be afforded ASL inmates in the review decisionmaking process. Specifically, the Court requested that defendants include provisions for periodic review, for explaining to inmates proper modes of showing rehabilitation, for ASL inmates' right to compel witnesses to

1. The Court's April 21 Order was based on a review of the evidence, following an evidentiary hearing, by Honorable R.E. Longstaff, United States Magistrate for the Southern District of Iowa.

testify at review hearings, and for allowing conforming inmates an opportunity to prove their increasing ability to conform to the standards of life in GP.

After extensive discussion between the parties as to the minimal requirements for the ASL review plan,[2] it appeared they were near agreement on all but a few elements. On February 22, 1983, the United States Supreme Court decided *Hewitt v. Helms*, — U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Based on the holding of *Hewitt* defendants have re-opened several procedural issues that had already been agreed to and integrated in defendants' close management ("CM"—the descendant of "administrative solid lockup") policy. There are ten issues still in dispute.[3] The Court will address each issue and determine the minimal constitutional requirements.

**2.** On July 13, 1981, the parties filed a joint stipulation indicating that plaintiff had received $7000.00 in satisfaction of his claim for monetary damages. In addition the parties also stipulated at that time that plaintiff would enter a request for voluntary dismissal with prejudice on the Court's final acceptance of a plan for the review of inmates in CM.

**3.** The ten issues are: (1) whether an ISP inmate, once placed in CM, possesses a liberty interest in not being indefinitely retained in CM protected by the Due Process Clause of the Fourteenth Amendment; (2) what is the minimal frequency with which defendants must hold CM review hearings to comport with minimal due process requirements; (3) whether defendants are required, as an element of due process, to gradually release CM inmates, state reasons for retention of an inmate in CM, or explain what conforming conduct must be shown to gain release from CM; (4) whether the CM management control system is constitutionally valid; (5) whether defendants must provide CM inmates with written notice of impending CM review hearings to comport with minimal due process requirements; (6) whether CM review hearing notices contain an explanation of all evidence to be presented at the hearing to comport with minimal due process requirements; (7) whether defendants' cautionary-instruction criterion for CM review is constitutionally valid; (8) whether defendants' fear of adverse staff or inmate reaction criterion for CM review is constitutionally valid; (9) whether defendants are constitutionally required to allow CM inmates to compel the attendance of witnesses at review hearings; (10) and whether CM review hearings, to comport

It is important for all, including the Court, to recognize the distinction between the inmates' narrow range of liberty interests protected by the Due Process Clause of the Constitution and the privileges that may be extended to the inmates under the broad and discretionary authority prison officials have over the institutions they manage.[4] It is equally important for the court to use caution in raising privileges and freedoms granted by the administration as part of a good sound administrative policy to constitutional levels by virtue of that policy itself.

In *Hewitt v. Helms* the Supreme Court said:

> Respondent seems to suggest that the mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative segregation indicates the existence of a protected

with due process requirements, must be open to review of findings made at prior disciplinary or CM initial placement hearings.

**4.** In *Hewitt v. Helms*, — U.S. —— at ——, 103 S.Ct. 864 at 869, 74 L.Ed.2d 675 the Court stated:

> We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is "at best an extraordinarily difficult undertaking," *Wolff v. McDonnell, supra*, 418 U.S. [539], at 566 [94 S.Ct. 2963 at 2979, 41 L.Ed.2d 935 (1974)], and have concluded that "to hold ... that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum v. Fano, supra*, 427 U.S. [215] at 225 [96 S.Ct. 2532 at 2538, 49 L.Ed.2d 451 (1976)]. As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948).

liberty interest. We cannot agree. The creation of procedural guidelines to channel the decision making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the stricture of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the State chose to require.

*Hewitt v. Helms,* —— U.S. ——, —— – ——, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). The Court will approach the remaining issues with these principles in mind.

The express purpose for defendants' implementation of the current CM policy is

controlling of the intractable inmate, who by his behavior has identified himself as assaultive, predacious, riotous or disruptive to the institution ... [and] [t]o impress upon these inmates the inappropriate behavior will not be acceptable at the Iowa State Penitentiary and that only through acceptable behavior can they earn their gradual release and return to the general population of the Penitentiary.

*Close Management Policy* at 1. This nonpunitive purpose has been understood, though less formally expressed, for at least nine years. *Kelly v. Brewer,* 378 F.Supp. 447, 450 (S.D.Iowa 1974), *aff'd in pertinent part, rev'd in part,* 525 F.2d 394 (8th Cir.1975).

Although the purpose of CM is nonpunitive, the conditions for CM inmates are much more austere and restrictive than conditions for GP inmates. Under defendants' plan any inmate at ISP may be placed in CM if certain initial placement procedures are followed. However, the testimony shows that pursuant to the current plan, it is the policy and practice at ISP to place inmates who have finished an extended term of punitive, disciplinary segregation in CM. Defendants' plan currently establishes a "management control system," under which an inmate must spend at least ninety days in CM before being allowed to participate in work and educational programs.

**I. Liberty Interest Issue**

The overriding issue in this action is whether an ISP inmate, once placed in CM, possesses a liberty interest in not being retained indefinitely in CM that is protected by the Due Process Clause. There is no federal statute that prohibits ISP officials from retaining inmates in CM for years without procedural safeguards of any type. Thus, unless the Due Process Clause of the Fourteenth Amendment to the United States Constitution creates a limit, the Court is without power to require defendants to adopt procedural safeguards.

Defendants contend that the United States Supreme Court's holding in *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), must control the determination of this issue. According to defendants, *Hewitt* holds that no prison inmate has a liberty interest, based in the Due Process Clause itself, in not being segregated and confined for years in the relatively harsh conditions of CM. Furthermore, defendants contend that Iowa law and regulations do not create for the inmates such a liberty interest.

Plaintiff, on the contrary, asserts that the holding in *Hewitt* is more limited: The Due Process Clause itself does not prevent prison officials from summarily segregating an inmate on a temporary basis for nonpunitive reasons. Thus, plaintiff contends that an inmate's interest in not being indefinitely retained in CM may be protected by the Due Process Clause. In addition, plaintiff contends that the Iowa parole statute, present and past good conduct- and honor-time statutes, and prison policy and regulations create a liberty interest protected by the Due Process Clause.

■ The Court need not reach the issue whether the Due Process Clause implicitly creates an interest in not being indefinitely retained in CM because new state law and long-established prison policy and recent prison regulations create such an interest. Senate File 302, an act creating a new method for the earning of good conduct time, was enacted on May 25, 1983, and will affect all ISP inmates convicted after July 1, 1983. Under Senate File 302, inmates will earn good conduct time in two ways: (1) automatically, at a rate of one day for each day of good conduct; and (2) by participating satisfactorily in employment, an employment program, or an educational program, at a rate of five days per month.

Although defendants contend that all CM inmates will be treated in the same manner as GP inmates in determining good conduct time, defendants' management control system is itself based on limiting the educational and employment opportunities of inmates who have spent less than ninety days in CM. The Court finds that CM inmates have less opportunity to participate in educational and employment programs than GP inmates. As a result, CM inmates' efforts to realize their statutory right to five-days-per-month good conduct time will be hindered by retention in CM. Because CM inmates convicted after July 1, 1983, will lose their opportunity to acquire some good conduct time, the Court concludes that Senate File 302 creates a liberty interest protected by the Due Process Clause. See Hewitt v. Helms, —— U.S. ——, ——, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983); Martin v. Foti, 561 F.Supp. 252, 258–59 (E.D.La.1983).

The liberty interest in not being retained indefinitely in CM created by Senate File 302 is vested only in those inmates convicted after July 1, 1983. Long-standing prison policy and current written regulations also vest all other inmates with a protected liberty interest. As stated above, ISP officials have followed an unwritten policy since at least 1974 that there must be express reason for retaining an inmate in CM. Kelly v. Brewer, 378 F.Supp. 447, 450 (S.D. Iowa 1974), aff'd in pertinent part, rev'd in part, 525 F.2d 394, 401 (8th Cir.1975). The general rationale for retaining an inmate in CM was, and continues to be, that the inmate in some way presents a threat to the security at ISP. Id.; Close Management Policy at 1. Because prison officials have limited their discretion by requiring that this or a similar specific substantive predicate exist before an inmate is retained in CM, the Court concludes that past ISP policy and current ISP regulations also create a liberty interest protected by the Due Process Clause. See Hewitt v. Helms, —— U.S. ——, —— - ——, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); Bills v. Henderson, 631 F.2d 1287, 1293–94 (6th Cir.1980) (following Wright v. Economoto, 462 F.Supp. 397 (N.D.Cal.1976), aff'd mem., 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978)); Finney v. Mabry, 528 F.Supp. 567, 570 (E.D.Ark.1981).

■ Given that ISP inmates do possess a liberty interest protected by the Due Process Clause in not being indefinitely retained in CM, the Court must now determine what procedures defendants must afford the inmates in order to give constitutional protection to that interest.[5]

In determining what process is due, the Court must consider the private and governmental interests at stake in the CM review process, and the value of specific procedural requirements for that process. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1983). The Court finds that the balancing of private

---

5. The procedural requirements mandated by the Due Process Clause are flexible dependent on the particular situation. Hewitt v. Helms, —— U.S. ——, ——, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). Although the Court must accord deference to policies and procedures adopted by ISP officials, id. at ——, 103 S.Ct. at 869; Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878,

60 L.Ed.2d 447 (1979), the question of what minimal procedural safeguards are constitutionally required is one of federal law to be determined by the Court. Vitek v. Jones, 445 U.S. 480, 490–91, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980) (citing Wolff v. McDonnell, 418 U.S. 539, 560, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1970)).

and governmental interests can best be done by comparing the facts of *Hewitt* with those in this action. In *Hewitt* an inmate was placed in administrative segregation on December 3, 1978, pending a disciplinary hearing on charges that he had assaulted an officer and disrupted normal institutional routine. *Hewitt v. Helms*, —— U.S. ——, ——–——, 103 S.Ct. 864, 867, 74 L.Ed.2d 675 (1983). Within twenty-four hours, the inmate was informed of the charges and his right to a prompt hearing, which would be held in accord with the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974), that would effectively end his detention in administrative segregation. *Id.* at —— & n. 2, 103 S.Ct. at 867 & n. 2. Five days after being placed in administrative segregation, prison authorities held a hearing at which the inmate was allowed to explain his defense to the charges. *Id.* at ——, 103 S.Ct. at 867. Although no finding of guilt was made after the five-day hearing, due to insufficient information, prison authorities decided to retain the inmate in administrative segregation.

One month after being placed in administrative segregation, the Program Review Committee reviewed the inmate's status and made specific, express findings that the inmate still presented a threat to the security of the institution. *Id.*, 103 S.Ct. at 867. On the basis of the express findings, it was again determined that the inmate should be retained in administrative segregation. After a second misconduct charge concerning the December 3rd incident was filed, and fifty days after his placement in administrative segregation, the inmate was again afforded a full *Wolff*-type hearing at which the inmate himself testified. *Id.*, 103 S.Ct. at 868. Based on the evidence presented at the third hearing, the inmate received a six-month disciplinary segregation term and credit for his fifty-day stay in administrative segregation.

In contrast to the factual context of *Hewitt* (and what the *Hewitt* Court addressed itself to [6]), defendants will not be faced with exigent circumstances in the CM review decisionmaking process. Nonetheless, defendants want this Court to accept a CM plan that would allow for undefined "periodic" review, without written notice, without any right to compel witnesses' testimony, and without giving the inmate a meaningful opportunity to show conforming conduct during the first ninety days in CM.

The *Hewitt* Court found that the inmate's interest was not of great consequence because his initial placement in administrative segregation only meant a transfer from one extremely restricted environment to an even more confined situation, no stigma of wrongdoing attached to nonpunitive administrative segregation, and placement had no effect on parole opportunities. *Id.* at ——, 103 S.Ct. at 872. Under defendants' plan, however, the CM inmate's interest in not being indefinitely retained in CM is materially different from the inconsequential interest of the *Hewitt* inmate. First, there is a distinction between being placed in CM and being retained in CM. Although the *Hewitt* Court concluded that the inmate's fifty-day term in administrative segregation did not seriously infringe on his liberty interests, this Court must address itself to the possibility of inmates seeking review of CM confinement after months or years of retention in CM. *Kelly v. Brewer*, 525 F.2d 394, 396 (8th Cir.1975) (three years confinement); *Clark v. Brewer*, Civil No. 76–54–1 (S.D. Iowa Oct. 25, 1979) (Magistrate's Report & Recommendation) (ten years confinement); *see Burton v. Shapp*, 574 F.Supp. 637 at 640 (W.D.Pa.1983) (five years confinement); *Morris v. Travisono*, 549 F.Supp. 291, 292 (D.R.I.1982) (six years confinement); *United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 270–76 (E.D.Pa.1978) (four

---

**6.** Neither of the two issues before the Supreme Court in *Hewitt* were related to the retention of the inmate in administrative segregation for an indefinite period. *Helms v. Hewitt*, 712 F.2d 48,

49 n. 2 (3d Cir.1983). Thus, the Court's dicta at footnote nine, *Hewitt v. Helms*, —— U.S. ——, —— n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983), is of questionable precedential authority.

years confinement); *Calloway v. Fauver*, 544 F.Supp. 584, 589–92 (D.N.J.1982) (five years confinement). Thus, rather than a mere transfer to an even more confined situation, the Court addresses ISP inmates' interest in avoiding long-term segregation in a more confined situation.

The length of incarceration in CM is an element that affects the weight of the inmate's interest. The longer an inmate is forced to endure the relatively restrictive CM conditions, the more serious is the deprivation of liberty. Accordingly, an inmate's interest in being given greater privileges or being released to GP increases the longer he is retained in CM. *Burton v. Shapp*, 574 F.Supp. 637, 639–40 (W.D.Pa. 1983); *see Hutto v. Finney*, 437 U.S. 678, 686–87, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) (length of confinement in conditions materially different from GP is an element in determining what is cruel and unusual punishment); *Jackson v. Meachum*, 699 F.2d 578, 584 (1st Cir.1983) (long-term confinement itself generates a heightened due process review requirement).

In addition to the possibility of extended periods of CM confinement, continued confinement in CM will adversely affect ISP inmates' ability to earn some good conduct time, thus, in effect, lengthening their term of confinement at ISP. The Court also finds that, in some circumstances, extended confinement in CM may harm an ISP inmate's chances of obtaining parole. Thus, unlike the *Hewitt* inmate, the ISP inmate's interest is based in part on good conduct time and parole considerations. In summary, the interest of ISP inmates in not being indefinitely retained in CM is not inconsequential, but significant and variable—expanding every day that the inmate spends in CM.

The governmental interests in *Hewitt*, though merely representative of the possible governmental interests, show that governmental interests in initial placement are distinct from those in retention of an inmate in CM. The *Hewitt* Court found that the prison officials' interest in maintaining the security of the institution against the threat presented by the assaultive inmate was very weighty. *Hewitt v. Helms*, —— U.S. ——, ——, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). The summary, "purely subjective evaluations" called for in the initial placement hearing in *Hewitt*, however, are different from the determinations to be made at CM review hearings. After the inmate is placed in CM, where he ceases to be a security threat, the need for immediate action to preserve the security is eliminated. Although the security of the institution is still significant, the change in factual context decreases the threat to that interest. The inmate, after being placed in CM, can no longer alone or in combination with others plan and execute schemes harmful to institutional security.

The *Hewitt* Court found that prison officials' interest in isolating an inmate, thus protecting potential witnesses of misconduct from coercion or harm, was also very weighty. *Id.*, 103 S.Ct. at 872. In the factual context of CM review, however, that interest is also diminished. First, prison officials can identify and act to protect potential disciplinary hearing witnesses soon after the initial placement. In addition, the investigation and subsequent hearing should be held in a reasonably timely manner, *see Wright v. Economoto*, 462 F.Supp. 397, 404 (N.D.Cal.1976), *aff'd mem.*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (establishing seventy-two hour period for segregation pending disciplinary hearing); *Hughes v. Rowe*, 449 U.S. 5, 11, 101 S.Ct. 173, 177, 66 L.Ed.2d 163 (1980) (absent emergency conditions, segregation before disciplinary hearing may violate due process). Thus, an extended retention of inmates in CM can rarely, if ever, be based on the need to further investigate alleged misconduct.

In summary, the heightened interests of prison officials recognized by the *Hewitt* Court in the context of initial placement in administrative segregation decrease substantially after the inmate has been placed in CM and is seeking a return to GP. Having weighed the interests of ISP inmates and defendants, the Court shall balance

those interests and determine the value of procedural requirements in the context of the nine specific procedural issues remaining before the Court.

## II. Frequency of Close Management Review Issue

Defendants' CM plan provides for a review hearing every seven days for the first sixty days an inmate is in CM and, subsequently, a review hearing every thirty days. Defendants now, however, petition the Court to allow them to decrease the frequency of review hearings. Thus, the Court must address the issue how often CM review hearings must be held to comport with minimal due process requirements. As indicated above, while defendants' interests in retaining a person in CM is at its peak at the time of initial placement, the inmate's interest increases each day he is retained in segregated confinement. Review hearings are essential; without some method to check the progress of CM inmates, there is no ensuring that valid reasons continue to subsist during the period of segregation. *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir.1975); *Jackson v. Meachum*, 699 F.2d 578, 584 (1st Cir.1983); *Burton v. Shapp*, 574 F.Supp. 637, 640 (W.D.Pa.1983); *Calloway v. Fauver*, 544 F.Supp. 584, 602 (D.N.J.1982); *Drayton v. Robinson*, 519 F.Supp. 545, 551–52 (M.D. Pa.1981); *Bono v. Saxbe*, 450 F.Supp. 934, 945 (E.D.Ill.1978), *aff'd in pertinent part, rev'd in part*, 620 F.2d 609, 618–19 (7th Cir.1980).

Many ISP inmates will be placed in CM pursuant to a rule requiring CM referral after serving a thirty-day (or longer) term in disciplinary segregation. Because the inmates referred from disciplinary segregation will have already served extended terms in segregated confinement, their interest in prompt review of their continued segregation is heightened. Furthermore, the referred inmates' disciplinary segregation records will provide a relatively sound, objective basis for determining whether they have conformed their behavior to institutional norms. The value of a prompt post-referral CM review hearing is great. Accordingly, the Court concludes that there is a minimal, constitutional requirement that there be a CM review hearing for all inmates placed in CM after referral from disciplinary segregation within not less than one week of placement in CM.[7]

The need for, and value of, a prompt first CM review hearing is not as great for CM inmates not referred from disciplinary segregation. These "standard CM inmates" will have been provided with an initial CM placement hearing, will not have been deprived of liberty as long as referred inmates have, and will not have been able to show their ability to conform their behavior. Based on these facts, the Court concludes that, to comport with due process, the first review hearing for standard CM inmates must be held not later than four weeks after initial CM placement.

Under defendants' CM plan, inmates are provided more frequent review hearings near the commencement of initial CM placement. Although this system may minimize the burden of holding review hearings for inmates who have continued to exhibit nonconforming conduct over an extended term in segregated confinement, the system is not designed to properly protect the interests involved. As determined above, a CM inmate's interests in not being indefinitely retained in the relatively restrictive confines of CM accrue over time while, over

---

7. The Court here assumes that virtually every inmate placed in CM after referral from disciplinary segregation will have served thirty or more consecutive days in disciplinary segregation before the referral. Any inmate referred to CM after having served less than thirty consecutive days in disciplinary segregation immediately before the referral must be credited with the disciplinary segregation days for purposes of calculating both the time for the first and all subsequent CM review hearings. For example, if an inmate served ten days in disciplinary segregation immediately before CM referral, then the inmate must be provided with his first review hearing at least by his twenty-seventh day in CM. In the factual situation in which an inmate has served more than thirty days in disciplinary segregation before CM referral, the Court concludes that there need be no more frequent CM review hearings than provided other referral inmates to comport with minimal due process requirements.

the same period, defendants' interests tend to decrease. The relative value of CM review hearings, however, also affects the constitutional requirement.

The value of a CM review hearing is generally greater after an inmate has had an opportunity to show in segregated confinement whether reasons subsist for continued CM detention. Review hearings held before there is a record for review are relatively worthless, while there is generally an increased value in review after an inmate has been in CM for a period during which he can show behavioral improvement. However, when an inmate has an extended record of nonconforming conduct in CM, that record is reliable proof that the inmate is relatively incorrigible. In such circumstances, the administrative burden of frequent review comes to outweigh the decreased value of the review proceedings, even when joined with the inmate's interests. Thus, the Court determines that, although the value of frequent review hearings increases steadily for a time, it later decreases when the record of the inmate's conduct while in CM establishes that he is relatively incorrigible.

■ Based on the fluctuating value of CM review hearings, and that CM inmates' interests increase relative to defendants' interests over time, the Court concludes that the constitutional minimum for the frequency of CM review hearings varies with the total amount of time each inmate has spent in any type of segregated confinement. Inmates referred to CM after serving thirty days or more in disciplinary segregation should be provided with, in addition to the first one-week review hearing, one four-week review hearing, then eight weekly review hearings, followed by monthly review hearings.[8] Standard CM inmates, in addition to their first four-week review hearing, should receive hearings within two months of initial CM placement, then weekly for eight weeks, followed by monthly review hearings.[9] This fluctuating review system accommodates the interests of CM inmates and defendants, while at the same time recognizing that CM review hearings are of little value in the case of an inmate who proves himself to be relatively incorrigible.

### III. Gradual Release Issue

■ Defendants and plaintiff have argued at length whether the Constitution requires that inmates be gradually released from the time of CM placement. The Court determines that "gradual release" is not required for inmates who have not been retained in CM for an extraordinarily long time. Nonetheless, there are established due process requirements that inmates placed in indefinite administrative segregation be provided with reasons for their retention, *Kelly v. Brewer*, 525 F.2d 394, 402 (8th Cir.1975); *Jackson v. Meachum*, 699 F.2d 578, 584 (1st Cir.1983); *Drayton v. Robinson*, 519 F.Supp. 545, 552 (M.D.Pa. 1981), and the right to know what conforming conduct has been shown and should be augmented in order to be released to GP. *United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 295 (E.D.Pa.1978); *Bono v. Saxbe*, 450 F.Supp. 934, 945 (E.D.Ill.1978), *aff'd in pertinent part, rev'd in part*, 620 F.2d 609, 618–19 (7th Cir.1980). Although there is no gradual release requirement based in the Due Process Clause, there is a minimal substantive due process requirement that defendants not retain inmates in CM status unless there is a reasonable basis for that detention. *Bono v. Saxbe*, 450 F.Supp. 934, 941 (E.D.Ill.1978), *aff'd in pertinent part, rev'd in part*, 620 F.2d 609, 617–18 (7th Cir.1980); *see Bell v. Wolfish*, 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (prison inmates possess certain limited constitutional rights); *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, — U.S. ——, ——, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (agency action normally subject to reversal if it is "so implausible that it could not be ascribed to a difference in view or . . . agency expertise.").

8. See Appendix A.

9. See Appendix A.

## IV. Management Control System Issue

█ Defendants have implemented a management control system consisting of a two-level program through which CM inmates must progress to be released to GP. Under defendants' system, every inmate placed in CM must serve a minimum of ninety days in the first level of the program ("Level A"), in which all inmates have been denied work and educational opportunities and allowed relatively limited exercise, telephone, and social privileges. Defendants have provided no reason for the mandatory ninety-day "term" in Level A, choosing rather to contend in brief and in argument that ISP inmates simply do not have a right not to be retained in the more restrictive conditions of Level A for that length of time. Defendants' proposed CM placement criteria demonstrate that there will be myriad reasons that ISP inmates may be placed in CM. Also, the inmates placed in CM will certainly conform to the rehabilitative conditions of CM at different rates. Thus, there is no rational basis for treating all CM inmates alike in requiring them to live in Level A status for ninety days. Although a brief evaluation period may be warranted, there is no reason other than punishment that inmates be retained in Level A for a predetermined term. Given the purpose of CM and the interests of the parties, defendants' sole rational course is to evaluate each inmate in CM periodically, balancing legitimate penological objectives and the inmate's interests in release to GP, and determine whether the particular inmate merits more or less privileges within CM or release to GP. Because the ninety-day term implemented as part of defendants' management control system is without a rational basis, the Court concludes that it violates the strictures of substantive due process and, thus, must be stricken. *See Bono v. Saxbe,* 450 F.Supp. 934, 941 (E.D.Ill.1978), *aff'd in pertinent part, rev'd in part,* 620 F.2d 609, 617–18 (7th Cir.1980).

## V. Written Notice Issue

Plaintiff contends, and defendants agree, that providing CM inmates with notice of an impending review hearing is a minimum due process requirement. However, the parties disagree on whether the notice must be written and whether the notice must contain an explanation of the nature of the evidence to be considered at hearing. In *Hewitt* the United States Supreme Court ruled that an inmate must be provided with such notice of an administrative segregation placement hearing that he is apprised of the charges against him and enabled to prepare his defense to the charges. *Hewitt v. Helms,* —— U.S. ——, ——, 103 S.Ct. 864, 874, 74 L.Ed.2d 675 (1983).

The factual context of CM review hearings is significantly different than that presented in *Hewitt.* Defendants will be able to schedule and plan for review hearings, whereas prison officials in *Hewitt* were forced to act with haste under emergency conditions. Furthermore, defendants will better understand the information that will be material in CM review hearings than the prison officials in *Hewitt* could have been of the subjective proof required for administrative segregation placement. *See Burton v. Shapp,* 574 F.Supp. 637, 640 (W.D.Pa.1983). These facts will serve to reduce the burden on defendants of giving written notice of the time of hearing and the evidence to be presented.

On the other hand, the Court finds that the evidence presented at CM review hearings will be highly repetitive. The majority of evidence presented by both CM inmates and defendants will likely have been presented at a prior hearing, especially during the period when weekly hearings are held. Furthermore, because the weekly review hearings may be held at regular days and times, CM inmates can easily determine the dates on which their weekly hearings will be held. These facts serve to reduce the necessity for written notice of the weekly CM review hearings.

█ Prior to an action that will affect a liberty interest protected by the Due Process Clause of the Fourteenth Amendment, a state must provide notice reasonably calculated, under the circumstances, to ap-

prise interested persons of the pendency of the action. *Mennonite Bd. of Missions v. Adams,* —— U.S. ——, ——, 103 S.Ct. 2706, 2709, 77 L.Ed.2d 180 (1983) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). In this case, the Court finds that CM inmates cannot reasonably be expected to determine the pendency of monthly CM review hearings. Accordingly, in circumstances in which there is more than one week between CM review hearings, defendants must provide CM inmates with written notice of the date and approximate time of review hearings. In the weekly review context, defendants need not provide a CM inmate with written notice if two elements are met: (1) defendants have an established, regular weekly CM review hearing schedule of which CM inmates are apprised; and (2) defendants do not intend to present any new evidence at the impending CM review hearing. In summary, because of the low cost of written notice, the value of the notice, and the significance of CM inmates' interests in knowing of impending review hearings, the Court concludes that CM inmates must be provided with written notice of the pendency of CM review hearings, at least two days before the hearings, (1) in all circumstances if a regular weekly CM review schedule is not devised; (2) in all circumstances in which new evidence is to be presented by defendants; and (3) in all circumstances in which more than a week has passed since the last scheduled CM review hearing. *See Bills v. Henderson,* 631 F.2d 1287, 1296 (6th Cir.1980); *Finney v. Mabry,* 528 F.Supp. 567, 574 (E.D.Ark. 1981).

## VI. Notice Content Issue

■■■■■ To be constitutionally adequate, defendants' notice of review hearings must afford CM inmates a reasonable opportunity to present their case. *Mennonite Bd. of Missions v. Adams,* —— U.S. ——, ——, 103 S.Ct. 2706, 2709, 77 L.Ed.2d 180 (1983); *Wolff v. McDonnell,* 418 U.S. 539, 564, 94

S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974); *Morrissey v. Brewer,* 408 U.S. 471, 486–87, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484 (1972). As stated above, much of the evidence presented at CM review hearings will have been presented at prior review hearings. Providing CM inmates with a summary of the evidence that has been presented at every review hearing would be of little value. On the other hand, it is very valuable, and beneficial to CM inmates' legitimate interests, that the inmates be informed of the gist of any new evidence [10] to be presented at an impending review hearing. Accordingly, the Court concludes that, in addition to the notice-of-time requirement explained above, defendants' notice must contain, to comport with minimal due process requirements, a summary of new evidence to be presented, in circumstances in which defendants will present such evidence.

## VII. Cautionary Instruction Criterion Issue

Plaintiff has challenged the legality of two criteria that defendants seek to utilize in the CM review decisionmaking process. First, plaintiff attacks the cautionary instruction that provides:

> Behavior within the unit does not necessarily reflect a behavior change that would carry over to release to the general population. Therefore, the inmate's actions within the unit are weighed heavily for in unit progression, but are not to be emphasized for release out of the unit. The focus for out of unit placement should be on possible potential behavior and the possible impact of release on the general population as outlined in the psychological reports.

According to plaintiff, this instruction to the review committee puts each CM inmate in a dilemma: the inmate is denied the opportunity to show his ability to conform to GP living standards norms at the same time his exclusion from GP is used as a reason to retain him in CM. Plaintiff also

---

**10.** New evidence, as the term is used here, is any evidence not presented at a prior CM re- · view hearing.

contends that "possible potential behavior" and "possible impact of release" are so vague that defendants, in effect, arrogate to themselves absolute discretion in the review decisionmaking process. However, as the CM review decision necessarily involves a prediction of future behavior, it must contain elements of subjective judgment.

 It is proper to allow defendants considerable discretion in establishing CM review criteria. *See Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir.1975). The alleged "Catch 22" criterion challenged by plaintiff does not require that inmates' behavior while in CM be disregarded. Rather, under the instruction and the review criteria, such behavior must be considered but not given inordinate weight. The Court also finds that, although "possible potential behavior" and "possible impact on the general population" are vague terms, the terms must be read in light of the review criteria set forth in the defendants' CM plan. Only if an inmate constitutes a threat to security in GP, under the five review criteria, may defendants discount the inmate's behavior in CM and retain him in CM. Thus, when read *in pari materia*, defendants' cautionary instruction actually requires some consideration of an inmate's CM behavior record for release determination, and is not unconstitutionally vague. The instruction may be used in the review decisionmaking process.

## VIII. Staff and Inmate Reaction Criterion Issue

Plaintiff contends that it is not constitutionally acceptable that fear of adverse staff or inmate reaction be considered as a criterion in the CM review decisionmaking process. Defendants, based on a quote from *Hewitt*,[11] argue that it is proper that they be allowed to consider this element. Although the plan otherwise provides for consideration of the actual threat to security posed by a CM inmate, defendants seek through this criterion to inject into the review process the emotional reactions of third parties.[12] The Court finds that the principle quoted from *Hewitt* is inapposite in the context of this action.

 The more time spent by an inmate in CM or another type of restrictive confinement, the more objective evidence will have accumulated to aid the officials in determining the need for retention in restrictive confinement. Defendants can and should find that the required psychological reports, the inmate's behavior while in CM, and a thorough investigation of information relevant to the review criteria will be helpful in making a sound decision as to the inmate's progress. *See Burton v. Shapp*, 574 F.Supp. 637, 640. (W.D.Pa. 1983). *Kelly v. Brewer* must be followed. Accordingly, defendants cannot include consideration of adverse staff or inmate reaction as a criterion in the CM review decisionmaking context. *Kelly v. Brewer*, 525 F.2d 394, 401 (8th Cir.1975).

## IX. Compulsion of Witness Attendance Issue

Plaintiff challenges defendants' current CM plan because it does not provide for the

11. The defendants cite the Supreme Court's finding that

> [i]n assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even

more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely ... subjective evaluations and on predictions of future behavior." *Hewitt v. Helms*, —— U.S. ——, —————, 103 S.Ct. 864, 872–73, 74 L.Ed.2d 675 (1983).

12. To buttress their argument, defendants state that the United States Court of Appeals for the Eighth Circuit's contrary ruling in *Kelly v. Brewer*, 525 F.2d 394, 401 (8th Cir.1975), is "bad law" after *Hewitt*.

right of inmates to call witnesses at CM review hearings. According to plaintiff, under the *Mathews* standard, inmates should be given the same, limited right to call witnesses as are inmates at disciplinary hearings, *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974), because both disciplinary segregation and CM implicate inmates' interests in good conduct time and parole consideration. Defendants contend that the administrative burdens and threat to security inherent in allowing CM inmates to call witnesses at review hearings outweigh any benefit that would be derived in improving the accuracy of review determinations.

As discussed above, although the decision whether to grant a CM inmate greater or lesser privileges or release to GP is predictive, there will be relatively objective information available for presentation at review hearings. Given defendants' review criteria, it is very likely that ISP staff members—such as CM guards, prison counselors, and psychologists—will possess information that the inmate will need to present to adequately argue his case. It may be invaluable to CM inmates and to accurate review determinations that staff members, who have viewed inmates in their limited opportunities to show conformance to institutional norms, be called as witnesses.

Furthermore, if defendants can show that allowing a certain witness to testify would create a security threat, under the *Wolff* standard that witness need not be compelled to testify. Under these circumstances, the Court finds that plaintiff's interests outweigh defendants' need to limit administrative burdens, and that permitting CM inmates a limited right to call witnesses is very valuable to accurate review determinations. Accordingly, the Court concludes that CM inmates must be allowed to call witnesses to testify at review hearings concerning inmates' conduct since the last review hearing that would tend to show some rehabilitation and to rebut any new evidence of improper conduct of which the inmate is notified. Defendants may exercise their discretion not to allow witnesses if it would create extraordinary security risks or if it is reasonably certain that the proposed witness has no relevant new information.

## X. Scope of Review Issue

Plaintiff has objected to defendants' limitation of the scope of CM review to only that evidence applicable to progression within CM except when evidence is newly discovered after the CM placement hearing. According to plaintiff, inmates' due process rights are violated unless they can not only present their arguments as to progression, but also re-litigate facts found at the initial CM placement hearing or disciplinary hearing. Defendants contend that it is rational to limit the scope of hearing, thus reducing administrative costs.

Inmates may be placed in CM only after an initial placement hearing or on being automatically referred to CM from disciplinary segregation, in which case the inmate has had a prior disciplinary hearing. *Close Management Policy* at 3. At the initial placement hearing or disciplinary hearing the facts on which CM placement is based are adjudicated and established. The inmate has both incentive and opportunity to argue his case. The factfindings may be appealed through administrative channels and to the courts. There is no reason, given the ability of every CM inmate to litigate and challenge factfindings made at the placement hearing, that the factfindings should be continuously relitigated in CM review hearings. *See Gear v. City of Des Moines,* 514 F.Supp. 1218, 1221–24 (S.D.Iowa 1981) (clarifying elements of administrative res judicata).

Review hearings are intended to protect the inmates' interests in not being indefinitely retained in CM. Challenges to the accuracy of prior factfindings would unduly complicate review hearings, generating needless expense, unless new evidence has been discovered. Because review hearings are properly reserved for the issue of inmates' progress through CM, and prior factfindings may be adequately

litigated and challenged in other, more appropriate forums, defendants need not allow inmates to challenge factfindings unless an inmate shows he has uncovered material, new evidence.

The Court realizes that defendants must have considerable discretion in implementing their CM policy. Controlling the recalcitrant inmate—an eminently meritorious purpose—is best left persons who manage the day-to-day affairs of the penitentiary. *Hewitt v. Helms*, —— U.S. ——, ——, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Being fully mindful of this proposition, however, the Court must ensure that plaintiff's constitutional rights, even though limited, are secured through minimal procedural safeguards.

The Court expects, and is probably entitled to, criticism for recognizing that courts must leave prison administrative details to prison officials and then setting specific requirements and labeling them constitutional minimums. It has done so reluctantly as both parties requested guidance on the matters in dispute. In this action the Court addressed itself to ten specific issues concerning constitutional rights of inmates to review of their indefinite confinement in CM at ISP. Analyzing the competing interests and value of specific procedural safeguards, the Court has determined what it believes to be the minimal constitutional requirements for defendants' CM plan.

IT IS SO ORDERED.

## APPENDIX A

### Required Frequency of Review Hearings After CM Placement

| | 1st Hearing | 2d Hearing | 3d Hearing | 4th Hearing | 5th Hearing | 6th Hearing | 7th Hearing | 8th Hearing | 9th Hearing | 10th Hearing | 11th Hearing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Inmates Referred From Disciplinary Segregation * | 1 week | 4 weeks | 5 wks. | 6 wks. | 7 wks. | 8 wks. | 9 wks. | 10 wks. | 11 wks. | 12 wks. | 4 wks. after the 10th hearing and every 4 wks. thereafter |
| Standard CM Inmates * | 4 weeks | 8 weeks | 9 wks. | 10 wks. | 11 wks. | 12 wks. | 13 wks. | 14 wks. | 15 wks. | 16 wks. | 4 wks. after the 10th hearing and every 4 wks. thereafter |

\* See footnote 7.