Edward CLARK, Appellee,

v.

Lou V. BREWER, Warden of the Iowa State Penitentiary at Fort Madison; Calvin Auger, Director of the Iowa Bureau of Adult Corrections; and Kevin Burns, Commissioner of the Iowa Department of Social Services; Jack Baughman, David Scurr, Roland Macauley, Harry Woods, Harold Farrier, Victor Preisser, Catherine Williams, Michael Reagen, added defendants, Appellants.

Edward CLARK, Appellant,

v.

Lou V. BREWER, Warden of the Iowa State Penitentiary at Fort Madison; Calvin Auger, Director of the Iowa Bureau of Adult Corrections; and Kevin Burns, Commissioner of the Iowa Department of Social Services; Jack Baughman, David Scurr, Roland Macauley, Harry Woods, Harold Farrier, Victor Preisser, Catherine Williams, Michael Reagen, added defendants, Appellees.

Nos. 84–1281, 84–1354.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 8, 1984.

Decided Oct. 30, 1985.

Mark Hunacek, Des Moines, Iowa, for appellants.

Barbara Schwartz and Mary Getspudas, University of Iowa, Iowa City, Iowa, for appellee.

Before ARNOLD, FAGG, and BOWMAN, Circuit Judges.

FAGG, Circuit Judge.

The State of Iowa appeals from the district court's resolution of this 42 U.S.C. § 1983 action brought by Edward Clark, an inmate at the Iowa State Penitentiary. Clark cross-appeals on several issues. Except to the extent modified below, we affirm the decision of the district court.

The present action arises out of Clark's segregation in close management status in the Iowa State Penitentiary (I.S.P.). Close management is a nonpunitive status of indefinite duration intended to segregate from the general penitentiary population inmates posing a security threat to the institution. Inmates who are placed in close management experience significantly harsher conditions and have fewer opportunities to participate in certain institutional programs (*e.g.*, educational and work programs) than inmates that remain in the general penitentiary population.

Clark was initially segregated in close management in 1969. This segregation occurred after numerous disciplinary reports had been filed against Clark and most significantly after two separate incidents in which Clark killed both another inmate and a penitentiary guard. After approximately seven years in close management, Clark, in

1976, filed this section 1983 action challenging as unconstitutional his continued segregation from the general penitentiary population. As relief, Clark sought both money damages and release into the general penitentiary population. Since filing this action, Clark has been released from close management, and the issue of compensatory damages has been settled.

■ Although initially inclined to believe otherwise, we conclude that Clark's release from close management and the settlement of his damage claims have not rendered this action moot. We believe that this action represents one of a narrow class of cases that by its nature is "capable of repetition, yet evading review." *See Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (citation omitted), and *Nebraska Press Association v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976) (quoting *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). This exception is applicable (1) when the relatively short term nature of the challenged action prevents its full litigation prior to its cessation or expiration; and (2) when there exists a reasonable expectation that the same complaining party will again be subject to the same action. *Murphy*, 455 U.S. at 482, 102 S.Ct. at 1183; *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *Backus v. Baptist Medical Center*, 671 F.2d 1100, 1103 (8th Cir.1982).

Although Clark's initial segregation in close management occurred over a significant period of time, the focus of our analysis, with respect to the first prong of this two part test, is not on the length of time over which the particular action challenged occurred. "Rather, the proper inquiry is whether 'the [challenged] activity is *'by its very nature' short in duration*, 'so that it could not, or probably would not, be able to be adjudicated while fully 'live.'''" *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir.1985) (emphasis in original) (quoting *Finberg v. Sullivan*, 634 F.2d 50, 55 (3d Cir.1980)); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980); *Nebraska Press Association*, 427 U.S. at 547, 96 S.Ct. at 2797; *Super Tire Engineering Co. v. McCorckle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974).

Close management as developed in Iowa satisfies this first requirement. In most cases, segregation in close management, while indefinite in length, lasts only a relatively short period of time. As a result, an inmate's segregation will normally terminate and the inmate will be returned to the general penitentiary population long before a challenge to his segregation in close management can be litigated fully. Thus, because close management is by nature short in duration, a challenge to its use will generally avoid review by this court if the release of the inmate is found to moot his claim.

Further, with respect to the second prong of the "capable of repetition, yet evading review" test, a reasonable expectation exists that Clark will again be subjected to segregation in close management. *See Murphy*, 455 U.S. at 482, 102 S.Ct. at 1183. Since his release into the general penitentiary population, Clark has received a variety of disciplinary reports and has spent time both in punitive segregation and close management. At the time of this decision, Clark is again in punitive segregation, and upon his release, the parties agree it is a virtual certainty that Clark will be returned to close management. The likelihood of this action is further indicated by a penitentiary regulation which provides that "inmates completing disciplinary sanction for thirty (30) or more days will be automatically referred for close management upon completion of disciplinary sanction." I.S.P. Close Management Policy at 3. We conclude Clark's action is capable of repetition, yet evading review and thus is not moot. We turn then to the merits of Clark's claim.

In this action, Clark does not challenge his original transfer to close management.

Rather, Clark asserts that once placed in close management, penitentiary officials were required to review his status periodically in order to determine whether he in fact continued to constitute a threat to the institution's security. Underlying Clark's claim is the related contention that inmates faced with indefinite segregation in close management have a liberty interest, protected by the due process clause of the fourteenth amendment, in remaining in or returning to the general penitentiary population.

The district court concluded that Clark did possess a constitutionally protected liberty interest. *Clark v. Brewer*, 578 F.Supp. 1501, 1505–06 (S.D.Ia.1983). In reaching this decision, the district court relied largely on state law as the source of that interest. We agree with the district court's conclusion that a liberty interest does exist in this case. However, we reach our conclusion on a basis slightly more limited than that relied on by the district court.

**Source of Clark's Liberty Interest**

■ As a general proposition, a liberty interest protected by the due process clause of the fourteenth amendment "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Clark does not seriously contend that the due process clause itself creates an interest in being confined in the general penitentiary population rather than close management. Nor, in light of *Hewitt*, do we believe he could. *See id.* at 467–68, 103 S.Ct. at 869–70. Instead, Clark focuses largely on state law as the source of a liberty interest.

■ A state created liberty interest arises in situations in which the state has placed substantive limitations on the exercise of official discretion. *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). Liberty interests created by the state may be "found not only in a state's statutes or administrative code, but also in official policy pro-

nouncements that are intended to guide the exercise of discretion." *Green v. Black*, 755 F.2d 687, 688 (8th Cir.1985); *see also Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 466, 467, 101 S.Ct. 2460, 2464, 2465, 2465, 69 L.Ed.2d 158 (1981) (opinion of Court and Brennan, J., concurring); *Parker v. Corrothers*, 750 F.2d 653, 660–61 (8th Cir.1984); *Jones v. Mabry*, 723 F.2d 590, 593 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

■ In determining whether state statutes, regulations, or policy statements place substantive limitations on the ability of penitentiary officials to retain an inmate in close management, there must exist in the statute, regulation, or policy statement particularized substantive standards or criteria that guide the exercise of discretion by penitentiary officials. *See Olim*, 461 U.S. at 249, 103 S.Ct. at 1747 (citing *Dumschat*, 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring)); *see also Parker*, 750 F.2d at 661. In making this determination, an important factor that must be considered is whether the statute, regulation, or policy statement in question contains language of a mandatory nature (*e.g.,* shall, will, must) similar in substance, form, or effect to the language of the Nebraska statute at issue in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). *See Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871–72; *Harmon v. Auger*, 768 F.2d 270, 273 (8th Cir. 1985); *Parker*, 750 F.2d at 656; *Evans v. Dillahunty*, 662 F.2d 522, 525 (8th Cir. 1981).

■ Applying these principles, the district court concluded that both state statutes and Department of Corrections policy (statewide and at the institutional level) gave rise to a protected liberty interest. *Clark*, 578 F.Supp. at 1506. While we decline to hold that any particular state statute creates a protectable liberty interest, we agree with the district court that a liberty interest has been created by official

Department of Corrections and I.S.P. policies. These policies were expressly promulgated to address the close management setting, and the state has never contended that these policies are for any reason inapplicable in the present action.

Turning first to statewide corrections policy, we look specifically to the Iowa Department of Corrections Employees' Manual. That manual specifically addresses the issue of close management segregation. In reference to close management generally, the manual provides that inmates "may [be] place[d] in [close management]" if their "continued presence in the general population poses a threat to life, property, self, staff, or other inmates, [or] to the security or orderly running of the institution, or [if there exists] the medical necessity for such segregation." Department of Corrections Employees' Manual at II–F–38. By implication, if none of these factors is present, penitentiary officials have no discretion and cannot place an inmate in close management.

More specifically, as to inmates believed to present unacceptable security risks, the manual provides

[a]n inmate *may* be designated as intractable (unruly, stubborn, violent, and with serious behavior problems, etc.,) by the warden/superintendent when that inmate is destructive, or when the inmate flagrantly refuses to comply with orders and instructions issued by custodial staff. Intractable designations *will* be fully justified, in writing, and *will* be maintained in the management files. * * The intractable designation *will be immediately removed when the inmate demonstrates that destructive or flagrant refusal to comply with rules and instructions has ceased.*

*Id.* at II–F–39 (emphasis added); *see also id.* at II–F–39c (If the "reasons for initial placement" cease to exist, "the inmate *will* be released from segregation * * *.") (emphasis added). Additionally, once an inmate has been placed in close management, the employees' manual expressly requires that penitentiary officials periodically re-

view the inmate's status and sets out specific procedures to be followed in conducting these periodic reviews. *Id.* at II–F–39 to II–F–39a.

The employees' manual also provides that "[e]ach institution will have an implementing procedure that complies with the [Department's close management] policy [, and this implementing procedure shall be] prepared by the warden/superintendent or his representative." *Id.* at II–F–38. Accordingly, I.S.P. has adopted a detailed close management policy. Consistent with the Department of Corrections Employees' Manual, the purpose of this implementing policy is to "establish criteria, programs and uniform procedures for the controlling of the intractable inmate, who by his behavior has identified himself as assaultive, predacious, riotous or disruptive to the institution." I.S.P. Close Management Policy at 1. The I.S.P. close management policy goes on to outline in detail those factors that may be considered by penitentiary officials in determining either whether to place or retain an inmate in close management. *Id.* at 5–6. The policy further provides that upon review, these criteria will be examined to ensure that "valid reasons" exist for retaining the inmate in close management and to determine whether segregation is "no longer necessary." *Id.* at 6.

We believe the policy statements promulgated by the Department of Corrections and the I.S.P. constitute official policy pronouncements that are intended to guide the discretion of penitentiary officials. *See Olim,* 461 U.S. at 249, 103 S.Ct. at 1747. First, both the employees' manual and the related I.S.P. regulations set forth particularized substantive criteria that substantially guide the determination of whether an inmate may properly be placed in close management. *See* Close Management Policy at 5–6; Department of Corrections Employees' Manual at II–F–38 to II–F–39. Second, the employees' manual, which as stated applies to the I.S.P., provides with specific reference to close management that "[t]he intractable designation *will* be

immediately removed when the inmate demonstrates that destructive or flagrant refusal to comply with rules and instructions has ceased." Department of Corrections Employees' Manual at II–F–39; *see also id.* at II–F–39(c) (If the reasons for placement in close management cease to exist, "the inmate *will* be released from [close management.]") (emphasis added). The mandatory language of the manual clearly limits the discretion of penitentiary officials to retain inmates in close management "for any constitutionally permissible reason or for no reason at all," *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747 (quoting *Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2465) (Brennan, J., concurring), and thus fulfills the second factor necessary to the establishment of a state based liberty interest. *See Parker,* 750 F.2d at 661.

By reaching the conclusion that a state based liberty interest has been created, we necessarily reject two contentions advanced by the state. First, the state argues that because the provisions of the employees' manual are not governed by the rulemaking procedures of the Iowa Administrative Procedures Act, *see* Iowa Code § 17A.2(7)(k), these provisions may be changed at any time and cannot therefore give rise to a protected liberty interest. We disagree.

■ Whether departmental or institutional policies give rise to a protected liberty interest is not determined by whether or not an agency complied with or was required to comply with a state's administrative procedures act. Rather, at issue in such a case is whether the policies were intended to guide the discretion of agency officials. *See Parker,* 750 F.2d at 660–61. Here, the employees' manual promulgated by the Department of Corrections applies to all institutions within the state, including the I.S.P.. The policies adopted by that manual limit and direct the exercise of discretion on the part of I.S.P. officials, and to the extent these statewide policies remain in force, I.S.P. officials are bound to abide by them. Further, although I.S.P. officials may at any time change their implementing policy, to the extent statewide policy remains the same, any changes undertaken at the institutional level must remain consistent with the department's statewide policies. At bottom, it is now settled within this circuit that "while it may be necessary that a regulation be promulgated or published under A.P.A. standards in order to become a 'rule of law,' a regulation or policy statement need not necessarily be a 'rule of law' in order to create a liberty interest." *Id.* at 659.

■ Second, we also reject the state's contention that the policies adopted by it may not give rise to a liberty interest because in part they were adopted to comply with decisions of this court which, in light of subsequent Supreme Court decisions, are now suspect. *See, e.g., Kelly v. Brewer,* 525 F.2d 394 (8th Cir.1975) (implicitly assuming that the due process clause in and of itself protects inmates detained in close management). We note simply that as the law now exists, the policies adopted by the Department of Corrections and the I.S.P. create a liberty interest in remaining in or returning to the general penitentiary population. However, contrary to the state's assertion, that decision does not permanently bind the state's discretion. Rather, the state is entirely free to modify or repeal the policies at issue in order to remove the substantive limitations on official discretion that now exist.

■ Having determined that a liberty interest does in fact exist in this case, we must next determine what process is necessary to protect that interest. The requirements imposed by the due process clause are flexible in nature and vary with the circumstances being examined. In determining what process is required, we must consider "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872 (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).

We generally agree with the district court's identification of the relative inter-

ests at stake in this action. *Clark,* 578 F.Supp. at 1506–09. The governmental interest here involved is far from insignificant in that "[t]he safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872 (citations omitted). This interest as a whole is a constant and overriding concern of all prison officials. We do note, however, that with respect to any one inmate, once that inmate is removed from the general prison population, the threat posed by that particular inmate naturally diminishes.

The inmate's interests, on the other hand, are somewhat variable. During the initial period of segregation the inmate's interest is of little consequence. As in *Hewitt,* the inmate is in effect "merely transferred from one extremely restricted environment to an even more confined situation." *Id.*

However, unlike the situation in *Hewitt,* the district court found that at least in some instances an extended period of confinement may have some indirect impact on parole opportunities and on the earning of good time credits. *Clark,* 578 F.Supp. at 1508. Further, as the state itself concedes, inmates in close management have less opportunity to participate in institutional programs. Appellants' Brief at 7; *see also Clark,* 578 F.Supp. at 1506. However, while the I.S.P. inmate may have a somewhat greater interest than that of the inmate in *Hewitt,* we still believe that in general a relatively informal, nonadversarial procedure is sufficient to protect that interest.

We turn finally to a determination of what process is necessary to protect the liberty interest created by departmental and institutional policies. The district court reviewed numerous contentions by the parties concerning what process was or was not required. We need address only those procedures specifically considered by the district court. In so doing, we must keep in mind the Supreme Court's recent statement that

'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators.' [*Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 2400 n. 14, 69 L.Ed.2d 59 (1981).] In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and long-standing relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on 'purely subjective evaluations and on predictions of future behavior,' *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464 [101 S.Ct. 2460, 2464, 69 L.Ed.2d 158] (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by [the inmate].

*Hewitt,* 459 U.S. at 474, 103 S.Ct. at 872 (emphasis added) (footnote omitted).

**Frequency of Review Hearings**

In its opinion, the district court set out a detailed scheme for the determination of when periodic review hearings were to occur. The court required that

[i]nmates referred to [close management] after serving thirty days or more in disciplinary segregation should be provided with, in addition to the first one-week review hearing, one four-week review

hearing, then eight weekly review hearings, followed by monthly review hearings. Standard [close management] inmates, in addition to their first four-week review hearing, should receive hearings within two months of initial [close management] placement, then weekly for eight weeks, followed by monthly review hearings.

*Clark,* 578 F.Supp. at 1510 (footnotes omitted). The state contends that this highly structured set of review hearings goes beyond what is constitutionally required by due process. We agree.

■ While some type of reasonable, periodic review is constitutionally required in this case, *see Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9, we believe the frequency of that review must in most cases be left to the informed discretion of prison officials. A wide variety of situations will confront penitentiary officials, and while in one case the type of situation involved will necessarily require a relatively long period of segregation, in another only a short period of segregation may be necessary. In this case, the plan adopted by the Department of Corrections calls for a hearing "every seven * * * days for the first two months," followed by regular review hearings "every [thirty] days thereafter." Department of Corrections Employees' Manual at II–F–39. We conclude the frequency of hearings presently required by state policy is constitutionally sufficient. To require more frequent hearings would be of little or no benefit to any individual inmate while at the same time significantly increasing the administrative burden on penitentiary officials.

**Notice and Content of Notice**

The district court concluded and the state agrees that if due process applies, reasonable notice (at a minimum the time and place of the next hearing) must be given. The district court concluded, however, that this notice must be in writing (1) if no regular weekly review session has been established; (2) if new evidence is to be presented at the hearing; and (3) if more

than a week has passed since the previous review hearing. *Clark,* 578 F.Supp. at 1512.

■ To the extent that new evidence, not previously relied upon by the state in continuing an inmate's segregation, will be used as a basis for his continued segregation, we agree with the district court that a brief written description of this evidence should be provided to the inmate. Such notice will enable the inmate to respond to this new evidence and will prevent undue surprise. *See Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974).

■ In situations in which new evidence will not be presented, we conclude written notice will be required in only three situations: (1) when review hearings occur more than a month apart; (2) when review hearings held up to a month apart are not scheduled on a regular periodic basis; and (3) when review hearings held up to a month apart are scheduled regularly but for some reason a scheduled hearing must be held at a time other than regularly scheduled. In cases of regularly scheduled review hearings occurring one month or less apart, the establishment of a regular hearing schedule will itself constitute sufficient notice.

**Staff and Inmate Reaction**

■ The state contends that fear of adverse staff reaction or adverse inmate reaction may be considered as criteria in the close management review process. The district court rejected that position. *Clark,* 578 F.Supp. at 1513. To the extent that the mere possibility of adverse staff or inmate reaction, absent any other reason for continuing an inmate's segregation, is used as a basis for continuing an inmate's segregation, we agree with the district court that this does not provide an adequate ground in and of itself upon which to keep an inmate in close management. *See Kelly,* 525 F.2d at 401.

However, to the extent that prison officials on the basis of their experience,

knowledge of the institution, and informed intuition reasonably conclude that an inmate's release into the general penitentiary population will result in adverse prisoner reaction or will in some way endanger the penitentiary staff, such criteria may provide a legitimate basis for retaining an inmate in close management. By necessity, the judgment of penitentiary officials in these types of situations will not be easily measured in objective terms. Instead, their determination must often of necessity be based upon many "imponderable factors" which necessarily take into account "purely subjective evaluations and * * * predictions of future behavior." *Hewitt,* 459 U.S. at 474, 103 S.Ct. at 873 (quoting *Dumschat,* 452 U.S. at 464, 101 S.Ct. at 2464).

**Right to Call Witnesses**

The district court also concluded that inmates should generally be allowed to call witnesses unless to do so would result in an unacceptable security risk. *Clark,* 578 F.Supp. at 1513–14. We generally disagree.

Clearly, penitentiary officials must engage in some sort of periodic review in order to determine whether an inmate placed in close management remains a security risk. *Hewitt,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. However, unlike a *Wolff* type disciplinary hearing, the determination to be made, while involving a certain amount of objective factfinding, is primarily focused on subjective evaluations and predictions of future behavior. This type of hearing is "singularly unsuited for 'proof' in any highly structured manner." *Id.*

To the extent factfinding of a sort does occur, this generally will involve relatively routine reports such as the inmate's overall conduct, appearance, and work habits. *See, e.g.,* Department of Corrections Employees' Manual at II–F–39 ("The review will consider conduct, disciplinary, observation, and work reports along with cell inspections and prior recent unfavorable conduct or the seriousness of the incident."). These types of reports, which play a significant role in the day-to-day administration of the penitentiary, are not the type of factfinding substantially benefitted either by an adversarial hearing or by a right to call witnesses. Consequently, we believe that a relatively informal nonadversarial review of the situation, including consideration of current prison conditions and tensions, will be sufficient in most instances. This type of review will normally enable penitentiary officials to exercise reasonably their professional discretion and would not be appreciably aided by the right to call witnesses.

We do, however, conclude that one relatively narrow situation exists under which inmates should be allowed to call witnesses. Specifically, if, since the previous review hearing, an inmate has engaged in conduct that normally would result in a disciplinary report, and if that conduct has not yet been addressed in a disciplinary hearing, the inmate should be allowed to call witnesses to the extent penitentiary officials are inclined to rely on this conduct as a basis for continuing the inmate's segregation.

These situations are akin to the past-misconduct issue typically presented in disciplinary proceedings, and as in those cases, the inmate "faces a severe credibility problem" when trying to disprove the charges of a penitentiary official. *Graham v. Baughman,* 772 F.2d 441, 445 (8th Cir.1985) (citation omitted). Allowing an inmate to corroborate his story will often make more credible "an otherwise bald and self-serving position." *Id.* at 445. In such a situation, unless an inmate is allowed to present effectively his side of the story, close management may be continued on an unsubstantiated factual basis and may in effect become a substitute for disciplinary proceedings and segregation. As with disciplinary proceedings, however, this right to call witnesses is limited and will not apply when calling witnesses is "unduly hazardous to institutional safety or correctional goals." *Ponte v. Real,* —— U.S. ——, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553

(1985) (quoting *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979).

**Other Issues**

The district court also addressed several other issues, including the scope of the review process, *Clark,* 578 F.Supp. at 1514–15, whether inmates have a constitutional right to gradual release from close management, *id.* at 1510, and whether a particular cautionary instruction contained in the I.S.P. policy statement could properly be considered by the review committee, *id.* at 1512–13. We have reviewed the district court's analysis on these issues and agree with that analysis with one exception.

 The district court in discussing the issue of gradual release, while finding no constitutional right to such release, stated that inmates have "the right to know what conforming conduct has been shown and should be augmented in order to be released to" the general penitentiary population. *Id.* at 1510 (citations omitted). We disagree with this statement to the extent the district court intended to require officials to set criteria that if met would guarantee an inmate's release. We believe an inmate need only be made aware of the basis for his segregation and, following review, why that segregation will be continued. Whether at a future hearing the inmate will continue to constitute a security risk will depend not only on his conduct but many other institutional factors that may properly be considered by penitentiary officials.

Finally, the district court addressed a management control system issue. *Id.* at 1511. Neither side has appealed the district court's resolution of this issue. Thus, we have no need to address this issue and decline to do so.

**Conclusion**

We conclude that a liberty interest is created by the official policies and procedures of the Department of Corrections and the I.S.P. as they are now drafted. We also conclude that except to the extent modified by our opinion, the district court

properly determined what process was required to protect that interest.

Affirmed as modified.