**Keith A. JACKSON, Jr.**

v.

**Barbara BOSTICK.**

**Joseph Mario TURNER**

v.

**Barbara BOSTICK.**

**John Oliver MINOR**

v.

**Sam SAXON, et al.**

**Civ. Nos. JFM–89–2489, JFM–89–2986 and JFM–90–2102.**

United States District Court, D. Maryland.

Jan. 29, 1991.

Joshua Treem, Schulman, Treem, Kaminkow & Gilden, P.A., Baltimore, Md., for plaintiff Jackson.

Burton H. Levin and Frank Derr, Dept. of Law, Baltimore, Md., for defendant Bostick.

Michael Skojec, Gallagher, Evelius & Jones, Baltimore, Md., for plaintiff Turner.

John Oliver Minor, Hagerstown, Md., pro se.

Steven Eric Schenker, Michael Whalen, Upper Marlboro, Md., Stephanie Lane Weber, Baltimore, Md., for defendant Saxon et al.

## MEMORANDUM

MOTZ, District Judge.

These three actions raise the question of whether an inmate's constitutional rights

are violated when he is placed on administrative segregation on the basis of an allegation made to prison authorities that he constitutes an escape risk.[1] Civil No. 89–2489 is brought by Kenneth A. Jackson, Jr., against Barbara A. Bostick, Commissioner of Corrections at the Baltimore City Jail (the "City Jail" or "Jail"). Civil No. 89–2986 is brought by Joseph Mario Turner against Bostick.[2] Civil No. 90-2102 is brought by John Oliver Minor against officials of the Prince George's County Detention Center ("PGCDC") and officials of the Maryland Reception Diagnostic & Classification Center ("MRDCC"). The defendants have moved to dismiss or for summary judgment in all three of the cases.

## I.

Although there are factual similarities in the three cases, the particular circumstances of each plaintiff differ. I will briefly summarize the facts pertaining to each of them.

### Joseph Turner

On September 20, 1989 three Baltimore City Police officers arrested Turner, who had several arrest warrants outstanding, at Pimlico racetrack. During his arrest, Turner fought with the officers, shooting one of them in the foot. He was charged with assault with intent to murder and a felony handgun violation. He was detained at the City Jail pending trial.

On September 22, Detective Dyson of the City Police telephoned Samuel Hawkins, a correctional officer at the Jail. Dyson informed Hawkins that Turner had shot a police officer and was an "extreme escape risk." The same day, Detective Sgt. Robert Sharp of the Police Department wrote a letter to Hawkins concerning Turner. Sharp wrote that Turner had "numerous outstanding warrants" and "poses an escape threat at all times due to these charges and when conducting the investigation to locate him, we discovered that he told many people 'that he would not go to prison.'" Sharp noted that Turner fought with police during his arrest and "injured three (3) police officers." He concluded by emphasizing that "this prisoner poses an escape threat and should be heavily watched and guarded."

Acting upon this information, Melvin Richardson, the Shift Commander at the Jail, directed Ronald Jackson, a correctional officer, to complete a Disciplinary Action Report for Turner. The DAR indicated that "Per Balt. City Police Dept., Resident is considered a [sic] escape risk. Resident is charged with shooting a police officer." Richardson determined that the DAR alleged a "major infraction," and ordered Turner to be placed in administrative segregation pending a hearing.[3]

The next day, Turner appeared before Hearing Commissioner John A. Hays. Turner alleges that after receiving a copy of Sharp's letter, he tried to call as witnesses the police officers who had accused him of being an escape risk. The officers did not appear, however. Based solely on Sharp's letter and Dyson's phone call, Hays ordered Turner confined in administrative segregation.

Turner appealed Hays's decision unsuccessfully to Bostick. In connection with the appeal, James Drewry, a jail official, spoke with Detective Sgt. Sharp, the au-

---

1. The three actions have been filed independently of one another and have not been formally consolidated. Nevertheless, I have issued a single opinion because of the commonality of the issues presented.

2. Turner seeks to amend his complaint to add John A. Hays, a Hearing Commissioner at the City Jail, as an additional defendant. Since I find that Hays would be entitled to the defense of qualified immunity, I will deny the motion to amend on the ground of futility. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

3. A "major infraction" is a term of art under the consent decree entered in *Duvall v. Schaefer,* No. K–76–1255, 1988 WL 228561 (D.Md. Aug. 30, 1988), a class action suit before Judge Kaufman. It is the type of violation of prison rules which triggers a series of procedural rights in punitive segregation cases. Although the term has no application in administrative segregation cases, Richards apparently made his determination that the DAR against Turner alleged a "major infraction" in order to assure that Turner would have a hearing before the Hearing Commissioner.

thor of the letter. Sharp merely repeated the substance of his letter and did not provide any further information to support his conclusion that Turner was an escape risk.

Turner remained on administrative segregation at the Jail until February 10, 1990, when he was transferred to another prison. While on administrative segregation, he was alone in his cell for at least 20 hours per day. Unlike residents in the general jail population, Turner wore an orange jumpsuit and was precluded from working in the jail, attending special jail events or having "contact" visits. His only regular opportunity to leave his cell was for one hour per day of recreation. He received meals, counseling, religious services, and library services in his cell. Hays reviewed Turner's file at least once a week, but did not return Turner to the general jail population. Turner apparently was a model prisoner during his stay at the Jail, but this fact did not affect the duration of his stay on administrative segregation. Hays testified on deposition that he would have changed Turner's status only if the police department had advised him that Turner was no longer an escape risk.

*Kenneth Jackson*

On March 28, 1989, Jackson was indicted in New York on a variety of charges, including murder and kidnapping. On April 21, 1989, he was arrested in Baltimore and confined at the City Jail. On July 17, 1989, Maryland authorities filed a warrant for Jackson's extradition to New York.

On July 21, 1989, Jackson appeared before a Maryland court and announced his intention to challenge his extradition warrant. The same day, an FBI agent called the Jail and informed officials there that according to an unidentified reliable informant, Jackson was planning an escape from the Jail. The FBI agent did not provide further details. Acting on this information, William Diggs, a correctional officer at the Jail, completed a Disciplinary Action Report for Jackson on the evening of July 21. Following completion of the DAR, Jackson was confined in administrative segregation pending a hearing.

On July 26, Jackson and his attorney appeared before Hearing Commissioner Hays. No evidence was introduced at the hearing. Hays sentenced Jackson to administrative segregation solely on the basis of the FBI's phone call. Jackson remained on administrative segregation until May 3, 1990, when he was extradited to New York. He was subjected to the same conditions as was Turner.

*John Minor*

Minor entered the PGCDC on February 9, 1988. At some point during the spring or summer of 1988, Minor was convicted of robbery with a deadly weapon, use of a handgun, and theft. On August 28, 1988, as Minor was awaiting sentencing, someone phoned the PGCDC and asserted that Minor was planning an escape. In light of this information and Minor's prior disciplinary problems,[4] PGCDC officials immediately placed Minor on administrative segregation. On September 1, Minor was sentenced to 40 years' imprisonment, and on September 8 he was transferred to the custody of state officials in Baltimore.

PGCDC officials sent a Transfer Alert sheet along with Minor, advising state officials that he was an escape risk. When he arrived at the MRDCC on September 8, Minor was placed on administrative segregation because of this sheet. On September 15 Minor appeared before a classification team and denied that he was an escape risk. After this proceeding the team ordered Minor returned to the general MRDCC population. On October 17, 1988, he was transferred to the Maryland Correctional Institute at Hagerstown, Maryland. He makes no claim that he has been placed on administrative segregation at that institution.

II.

■ The first question presented is whether plaintiffs have been denied proce-

---

**4.** In March 1988 Minor had been sentenced to 30 days of disciplinary segregation for breaking glass in a visiting booth during a visit.

dural due process. In order to establish a procedural due process claim, a plaintiff must prove that he possessed a protected liberty or property interest and that he was deprived of that interest without being afforded the process to which he was constitutionally entitled. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court considered whether a prison inmate who had been placed on administrative segregation after participating in a prison riot had been denied procedural due process. The Court held that the Due Process Clause itself does not confer upon an inmate a liberty interest in not being placed on administrative segregation. *Id.* at 468, 103 S.Ct. at 869. However, the Court found that Pennsylvania's statutes and regulations governing administrative segregation in issue in *Helms* did give rise to such an interest. Writing for the Court, Justice Rehnquist reached this conclusion somewhat reluctantly. He first noted that "the mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative confinement [does not indicate] the existence of a protected liberty interest." *Id.* at 471, 103 S.Ct. at 871. He then pointed out that "[i]t would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause." *Id.* Nevertheless, Justice Rehnquist found that "the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates." *Id.* at 471–72, 103 S.Ct. at 871. He concluded that "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected

liberty interest." *Id.* at 472, 103 S.Ct. at 871.

In the wake of *Helms,* courts have found that prison regulations, standing alone, can give rise to a protected liberty interest if they contain mandatory language and establish substantive predicates for the imposition of administrative segregation. *See Hayes v. Thompson,* 726 F.2d 1015 (4th Cir.1984) (prison regulations can create a liberty interest if they meet the criteria in *Helms* ); *Gittens v. LeFevre,* 891 F.2d 38, 40 (2d Cir.1989) (New York regulations meet *Helms* criteria); *Knight v. Armontrout,* 878 F.2d 1093, 1095 (8th Cir.1989) (same; Missouri regulations); *Sheley v. Dugger,* 833 F.2d 1420, 1424–25 (11th Cir. 1987) (same; Florida regulations); *Toussaint v. McCarthy,* 801 F.2d 1080, 1097–98 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) (same; California regulations); *Clark v. Brewer,* 776 F.2d 226, 231 (8th Cir.1985) (same; Iowa regulations). By the same token, regulations which give officials discretion to impose administrative segregation have been held not to create a protected liberty interest. *See Stephany v. Wagner,* 835 F.2d 497, 502 (3d Cir.1987), *cert. denied,* 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988); *Brown v. Cunningham,* 730 F.Supp. 612, 615 (D.Del.1990).

Turner and Jackson argue that the City Jail's Policy & Procedure 210–270 satisfies the *Helms* criteria. That document contains the following scattered passages relating to administrative segregation:

> Only the Hearing Commissioner is authorized to place a resident on Administrative Lock–Up or Segregation.

> A resident is placed on Administrative Lock–Up for administrative reasons (i.e., threat to security of the institution, threat to the safety of other residents or Jail staff, etc.).

> Residents placed on Administrative Lock-Up shall remain in that status until it is felt that he [sic] is no longer a threat to the security of the institution, safety of other residents and/or staff, etc. Release from Administrative Lock–Up may

be authorized by the Shift Commander or the Hearing Commissioner.

The Hearing Commissioner will review the records of those residents on Administrative Lock–Up weekly to determine whether their status should change.

None of these various provisions, except the last, are mandatory in their terms, and the last requires only weekly review of the records of inmates on administrative segregation without mandating any particular steps of the review process. Essentially, the decision of whether to place and keep an inmate on administrative segregation is left to the discretion of the hearing commissioner. Thus, Jail Policy & Procedure 210–270 does not create a liberty interest entitled to procedural due process protection under *Helms*.[5]

■ The PGCDC regulations pursuant to which Minor was placed on administrative segregation while he was held in Prince George's County even more clearly negate the existence of a liberty interest in not being placed on administrative segregation. Those regulations expressly provide that "administrative segregation is separation initiated at the discretion of the Director, the Administrator of Security or the Administrator of Programs for the purpose of maintaining internal control." Ch. 17, § IV(d) of PGCDC Rules & Procedures Manual. This language unequivocally forecloses the possibility of a protected liberty interest under *Helms*.

■ In contrast, Maryland's Division of Correction regulations, which are binding upon MRDCC, provide for a mandatory review procedure. They require, *inter alia,* that (1) an inmate be given a written notification of the reason for his placement on administrative segregation within forty-eight hours of the event giving rise to the placement, (2) within ninety-six hours of the placement, the inmate be seen by a classification team and given the opportunity to be heard on whether his administrative segregation status should be continued, (3) the inmate be advised at the hearing of the classification team's decisions and the reason for the decisions and (4) the warden review the decision of the classification team within five working days and advise the inmate in writing of his decision. Division of Correction Regulation 110–19.

■ It appears, and may be assumed, that these mandatory provisions are sufficient to create a protected liberty interest under *Helms*. However, the record establishes that Minor was granted all the procedural rights to which he was entitled under DCR 110–19 and, in fact, was released after the classification team concluded that he was not an escape risk. DCR 110–19 more than satisfies the *Helms* mandate that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Helms,* 459 U.S. at 476, 103 S.Ct. at 874. Therefore, Minor was not denied procedural due process.

### III.

In addition to assuring procedural due process, the Fifth and Fourteenth Amendments also protect individuals from governmental conduct which "shocks the conscience," *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), or which interferes with rights "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). This protection bears the name of "substantive due process." *See United States v. Saler-*

---

**5.** As indicated in Part IV, *infra,* I find that an inmate has a substantive due process right to have a hearing commissioner make an independent judgment in exercising his discretion when deciding whether to place the inmate on administrative segregation. I recognize the fine line between a procedural due process claim and a substantive due process claim in this context. However, a significant distinction between the two does exist. A hearing commissioner could comply with the regulatory mandate that he "will review the records" of an inmate held on administrative segregation as an escape risk simply by determining (as did Hearing Commissioner Hays) that a third party had provided information that the inmate was an escape risk. In contrast, as indicated *infra,* it is my view that substantive due process requires that a hearing commissioner exercise his critical faculties in evaluating the reliability of that information.

*no,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987).

The potential for abuse of judicial power which the doctrine of substantive due process creates is self-evident. What may "shock the conscience" of one judge may be entirely unremarkable to another, and one person's concept of "ordered liberty" may appear to someone else as nothing more than procedural fastidiousness. Therefore, a court, particularly a single district judge, should be extremely cautious in considering a substantive due process claim.

That said, and mindful of the proper limits on my power, I have concluded that to place an inmate in virtual solitary confinement for an extended period of time on the basis of a review by a hearing commissioner which is entirely *pro forma* in nature is inconsistent with the concept of ordered liberty. As a preliminary matter, let me confess that although the validity of this proposition is now clear to me, it was only the facts of the *Turner* case which brought the issue into focus for me. According to the evidentiary record, Turner was placed alone in a cell for at least twenty hours a day for almost six months based upon the bare allegation of a law enforcement officer that he constituted an escape risk. Although this was also true about Jackson, (whose case first came before me), what is unique about Turner's case is that the primary information upon which the "escape risk" allegation was based—that Turner had shot a police officer while resisting arrest—also demonstrated on its face a motive for police officers to seek to have Turner punished while he was awaiting trial. *Cf. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (substantive due process prohibits punishment before an adjudication of guilt). Yet Hearing Commissioner Hays testified on deposition that he, in effect, accepted the information provided by the police as the gospel truth and would not change his decision on Turner's status unless the police notified him that they no longer considered Turner a threat to escape.

I am fully aware of the extreme difficulties which prison officials have in keeping order at the institutions for which they are responsible. *See, e.g., Helms,* 459 U.S. at 472, 103 S.Ct. at 871; *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878; *Wolff v. McDonnell,* 418 U.S. 539, 560–63, 94 S.Ct. 2963, 2976–78, 41 L.Ed.2d 935 (1974). I also appreciate that they frequently must base their evaluation of whether a particular inmate is an escape risk upon information which they receive from persons outside of the institution. However, if the inmate challenges the accuracy of the information received, surely he is entitled to demand that officials at the institution where he is held exercise independent judgment in appraising the reliability of the information which the institution has received.

The review process need be neither formal nor extensive. Due process certainly does not require that every time an institution receives information that an inmate is an escape risk, a full-blown evidentiary hearing must be held before the inmate is placed on administrative segregation. Nor does due process require that the inmate be given the opportunity to cross-examine the witnesses against him. *Cf. Wolff,* 418 U.S. at 561–62, 567–69, 94 S.Ct. at 2977, 2980–81 (highlighting the security risks that could be created if prison inmates were allowed to cross-examine witnesses). Indeed, if circumstances so warrant, the identity of the person providing the information that the inmate is an escape risk may be kept confidential. If the informant were a family member, friend, purported accomplice or a regular source of information to law enforcement authorities, disclosure of his identity could not be reasonably expected. Likewise, if disclosure of the specific details of the information provided might realistically reveal the identity of a confidential informant, that information too could be withheld.

However, the fact that a hearing officer may base his decision upon information which he does not divulge to the inmate—or, indeed, which may not be divulged in all of its detail to him—does not relieve him of the duty to assess the information impartially and as critically as the circumstances

permit. Although obviously not dispositive, he should take into account the inmate's own testimony and his record of adjustment within the institution. In a case where the conditions of administrative segregation are extremely confining and last more than several days, the hearing officer should obtain a statement from the informant (or law enforcement officer receiving information from a confidential informant) which is under oath. And if the administrative segregation continues over an extended period, the inmate's status and the information upon which it is based must be periodically updated and reviewed. *Cf. Helms*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9 (procedural due process requires periodic review of inmates on administrative segregation); *Mims v. Shapp*, 744 F.2d 946, 954 (3d Cir.1984) (monthly "subjective" reviews satisfy this mandate); *Clark v. Brewer*, 776 F.2d 226, 234 (8th Cir.1985) (same; also approving weekly reviews for the first two months of segregation).

The responsibility for running penal institutions is a heavy one, and judges must not mandate procedures which unnecessarily invade the province of prison administrators. *See, e.g., Helms*, 459 U.S. at 472, 103 S.Ct. at 871; *Bell*, 441 U.S. at 547, 99 S.Ct. at 1878; *Wolff*, 418 U.S. at 560–63, 94 S.Ct. at 2976–78. However, responsibility must be met, not abdicated, and discretionary power must be exercised, not defaulted. While a hearing officer's decision is entitled to extreme deference, it must be based on his or her independent judgment. Otherwise, prisons will become a Kafka-esque world in which, solely on the basis of information for which no one is held personally accountable, an inmate can be placed alone in a cell for almost twenty-four hours a day, weeks and months on end.

### IV.

■ In short, I find that substantive due process requires that in a case where an inmate challenges an allegation that he is an escape risk, he be given an opportunity within a reasonable time after being placed on administrative segregation to appear before a hearing officer. The hearing officer must then make an independent determination, based upon information which he finds to be reliable, as to whether the inmate does constitute an escape risk.

■ The procedure established by Division of Correction Regulation 110–19 which was followed in the *Minor* case is wholly consistent with my holding. Further, the fact that Minor was released from administrative segregation after appearing before a classification team proves that, in fact, the classification team exercised independent judgment on the question of whether he constituted an escape risk. Therefore, the officials at the MRDCC who are named as defendants in the *Minor* case are entitled to summary judgment on the merits. Similarly, although the record is not fully developed as to the nature of the review procedure at the PGCDC, the record does establish that Minor was on administrative segregation there for only a brief period (from August 28, 1988 to September 8, 1988). The record further establishes that Minor's placement on administrative segregation at that institution was entirely reasonable. The action was taken in response to information provided in a telephone call made to the institution on August 28, 1988, that Minor was planning to escape; three days later he was sentenced to forty years' imprisonment; and he was held on administrative segregation for only seven more days until he was transferred to MRDCC.

■■ The *Turner* and *Jackson* cases are quite different. Hearing Commissioner Hays testified on deposition that he would have changed Turner's status only if the police department had determined that Turner was no longer an escape risk, and presumably his decision as to Jackson was the same. Therefore, the record is uncontradicted that Hays did not exercise any independent judgment as to whether Turner and Jackson constituted escape risks, as I have held he was required to do. Nevertheless, I am of the view that the defense of qualified immunity constitutes a bar to Turner's and Jackson's substantive due

process claims.[6]

■■■ The question of whether a defendant is entitled to assert qualified immunity turns upon whether the constitutional right which he violated was "clearly established" at the time of the violation. *See, e.g. Gooden v. Howard County,* 917 F.2d 1355, 1360–61 (4th Cir.1990). Three facts convincingly establish that the substantive due process right which I have articulated has not heretofore been a clearly established one. First, I have myself perceived the existence of the right only after prolonged consideration. Second, Turner and Jackson are both represented by exceedingly able counsel, and they did not raise the substantive due process issue. Third, the hearing procedures at the City Jail have been litigated in a class action suit before Judge Kaufman, *see Duvall v. Schaefer,* No. K–76–1255 (D.Md. Aug. 30, 1988), and a consent decree entered in that proceeding establishes no procedural requirements for administrative segregation cases.

## V.

■■■ The plaintiffs have also raised claims under the Eighth and Fourteenth Amendments. The defendants are entitled to summary judgment on these claims. Regarding the equal protection claims, no plaintiff has made out any claim that he was treated differently than any similarly situated inmates. "The Constitution does not require things which are different in fact ... to be treated in law as though they

were the same." *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). As for the Eighth Amendment claims, neither Turner nor Jackson were protected by the Eighth Amendment since neither had been found guilty of any crime at the time he was placed on administrative segregation. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Minor, for his part, has failed to raise a genuine factual issue regarding the constitutionality of the conditions which he endured while on administrative segregation. *See Sweet v. South Carolina Dep't of Corrections,* 529 F.2d 854 (4th Cir.1975) (ordinary conditions of administrative segregation do not constitute cruel and unusual punishment); *Toussaint v. McCarthy,* 801 F.2d 1080 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) (same).

A separate order effecting the rulings made in this memorandum is being entered herewith.[7]

## ORDER

### Civil No. JFM–89–2489

For the reasons stated in the memorandum entered herein, it is this 29th day of January 1991

ORDERED

1. Defendant's motion for summary judgment is granted; and

---

**6.** I note that in moving for summary judgment in the *Turner* case, Commissioner Bostick has expressly stated that she is not relying upon the defense of qualified immunity but rather upon the constitutionality of the procedures which were followed at the City Jail. However, Bostick made this statement in the context of plaintiffs' procedural due process claims, and I have ruled in her favor on the merits of those claims. I have raised the substantive due process issue *sua sponte,* and Bostick has not waived her qualified immunity defense as to that claim.

I also note that Turner has asserted a pendent claim under the Maryland Declaration of Rights. The Maryland Court of Appeals has held that the defense of qualified immunity is not available as to a state constitutional claim. *See Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 684, 541 A.2d 1303, 1314 (1988). However, since I am granting defendants' mo-

tion for summary judgment as to plaintiffs' federal claims, I will decline to exercise pendent jurisdiction over Turner's state law claim. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**7.** I am troubled by the fact that although I have ruled in favor of the defendants, my articulation of a substantive due process right on behalf of the plaintiffs may subject the defendants to liability in future litigation. It appears to me that if defendants believe that the views which I have expressed are mistaken, they have a right to appeal even though judgment is formally entered on their behalf. *Cf. Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 333–34, 100 S.Ct. 1166, 1171–72, 63 L.Ed.2d 427 (1980) (noting that a prevailing party may, without violating Article III, appeal "an adverse ruling collateral to the judgment on the merits").

2. Judgment is entered in favor of defendant against plaintiff.

## ORDER

### Civil No. JFM–89–2986

For the reasons stated in the memorandum entered herein, it is this 29th day of January 1991

ORDERED

1. Plaintiff's motion for leave to further amend complaint is denied;

2. Defendant's motion for summary judgment is granted;  and

3. Judgment is entered in favor of defendant against plaintiff.

## ORDER

### Civil No. JFM–90–2102

For the reasons stated in the memorandum entered herein, it is this 29th day of January 1991

ORDERED

1. The motion for summary judgment filed by defendant Merry Coplin is granted;

2. The motion to dismiss filed by defendants Sam Saxon, David Van Dyke and Alvin Martin is granted;  and

3. Judgment is entered in favor of defendants against plaintiff.